IN RE THE ESTATE OF: VERA YARBOROUGH WASHBURN, Deceased

No. COA02-1029

(Filed 17 June 2003)

1. **Trusts— delivery of property—stock certificates**

The trial court did not err by distributing one stock certificate to a trust and another to the estate, with the dividends divided accordingly. The certificate delivered to the trust was signed over to the trust and delivered to the trustees, even though the signature was not guaranteed as required to transfer the stock on the corporate books. The second certificate was not found until after the testator's death and was neither endorsed nor delivered to the trustees.

2. **Trusts— transfer of property—furniture and appliances**

The trial court did not err by assigning furniture and appliances to a trust where an "Assignment of Assets" was sufficient as a legal assignment of the property to the trustees. In the absence of statutory guidelines, the intent of the parties to pass legal title is the sole guide for personal property. Here, the retention of the property by the settlor during her life was consistent with an intent to pass title because the trust provided that the income and principal were to be used for her benefit during her life.

3. **Powers of Attorney— scope—transfer of funds to trust**

Deposits to a trust account of funds from closed bank accounts were within the scope of a power of attorney that specifically granted authority for banking transactions

and tax matters. These transfers clearly constituted banking transactions.

**4. Wills— transfer of property—power of attorney—will not changed**

A principal's assets were transferred to a trust under a power of attorney without altering or revoking the will.

Appeal by trustees Jerry Scruggs and John Cabiness and by co-executors Sylvia E. Hutchins and J.D. Champion from order and judgment filed 7 January 2002 by Judge W. Robert Bell in Cleveland County Superior Court. Heard in the Court of Appeals 19 May 2003.

*Deaton & Biggers, by A. Susan Biggers, for trustee appellants.*

*Essex Richards, P.A., by G. Miller Jordan, Lisa T. Kelly, and James C. Fuller; and Leslie C. Rawls for co-executor appellants.*

BRYANT, Judge.

Jerry Scruggs (Scruggs) and John Cabiness (collectively the trustees) appeal an order and judgment entered 7 January 2002 distributing the assets of Vera Yarborough Washburn (Washburn) between her estate and a trust established by her prior to her death. Sylvia E. Hutchins and J.D. Champion, the co-executors of Washburn's estate, also appeal from the January 7 order.

In this order, the trial court made the following undisputed findings:

1. [Washburn] . . . died on October 23, 2000.

2. On December 22, 2000, the Cleveland County Clerk of Superior Court probated [her] Last Will and Testament . . . .

3. . On December 22, 2000, Sylvia Hutchins and J.D. Champion, niece and nephew, respectively, qualified as Co-Executors of the Estate of . . . Washburn.

4. On September 16, 1999, . . . Washburn executed an Irrevocable Trust Agreement (hereinafter "Trust") appointing [the trustees].

5. Accompanying the Trust agreement was an "Assignment of Assets to Trust" . . . , which provides in part that all common stock, household furnishings and appliances, $550,000.00 in cash and an Oldsmobile automobile go to the Trust.

6. During October and November 1999, over $590,000.00 in funds [were] transferred from . . . Washburn to bank accounts in the name of the Trust. At the time of . . . Washburn's death, a total of over $612,000.00 had been received in trust accounts at Centura Bank from deposits and earnings.

7. At the time of her death, . . . Washburn was the record owner of two Branch Banking and Trust [(BB&T)] stock certificates totaling 27,016 shares, to wit:

    a.   BB&T stock certificate No. BBT080224 . . . for 13,508 shares, and

    b.   BB&T stock certificate No. BBT093753 . . . for 13,508 shares.

8. On the reverse side of stock certificate No. BBT080224 . . . appears the signature of . . . Washburn indicating a transfer on October 3, 1999[] of the stock certificate to the [t]rustees.

9. The signature of . . . Washburn on stock certificate No. BBT080224 . . . did not contain a "signature guaranteed" certification.

10. The trustees took possession of stock certificate No. BBT080224 . . . .

11. At the time of her death, . . . Washburn was in possession of stock certificate No. BBT093753 . . . , which was never delivered to the trustees.

12. In February or March 2001, following the death of . . . Washburn, the trustees located BB&T stock certificate No. BBT093753 . . . in . . . Washburn's residence. The reverse side of the stock certificate was blank, was not completed for transfer, was not signed by . . . Washburn nor was a signature guaranteed.

13. [Prior to Washburn's death,] [t]he trustees in November 1999 requested [BB&T] transfer ownership of all BB&T stock in the name of . . . Washburn to the Trust based upon the terms of the Trust agreement and assignment.

14. [BB&T] refused to make the transfer on its books on that basis and notified the trustees and . . . Washburn that the proper procedure for the transfer of the certificates on the records of the corporation[] would be to deliver to BB&T the duly executed stock certificates transferring ownership to the Trust. In the

IN RE ESTATE OF WASHBURN

[158 N.C. App. 457 (2003)]

event of a lost certificate, . . . Washburn would have to make an application for a replacement certificate and post an indemnity bond before the stock could be transferred to the Trust.

15. . . . Washburn and the trustees made no further attempts with [BB&T] to transfer any of the stock in the name of . . . Washburn to the Trust, pending trying to locate the certificate.

16. . . . Washburn continued as BB&T's record owner of the two BB&T stock certificates . . . and received in her name dividends from her stock totaling some $17,020.08 from September 16, 1999[] to the date of her death on October 23, 2000, which were deposited in trust bank accounts.

17. At the time of her death, . . . Washburn was the record title owner of the two BB&T [stock] certificates . . . .

18. The household furnishings and appliances remained in the possession of . . . Washburn from the date of the Trust until her death.

19. The Oldsmobile automobile title was not changed to the Trust and the vehicle remained in the possession of . . . Washburn from the date of the Trust until her death.

20. On September 18, 2000, . . . Washburn executed a deed of her residence to the trustees, which was filed at the register of deeds.

Based on these findings, the trial court concluded:

1. The assignment attached to the Trust agreement is insufficient to transfer all assets listed to the Trust.

2. [Washburn], with the requisite intent and delivery, did place in the [T]rust the following property:

    A.   All funds on deposit in trust accounts at Centura Bank as of October 23, 2000, and $50.00 [from the sale of an appliance in Washburn's residence after her death] deposited February 14, 2001.

    B.   The BB&T stock certificate No. BBT080224 representing 13,508 shares of BB&T stock.

    C.   All her household furnishings and appliances located in her home . . . .

    D.   [Washburn's] residence . . . .

3. Funds transferred to the Washburn [T]rust, including the $1,270.00 cash found in the decedent's home, or funds received after October 23, 2000, [totaling $11,847.11] are assets of the decedent's estate, except that one-half of each BB&T stock dividend check will belong to the Washburn [T]rust and one-half of each BB&T stock dividend check will belong to the decedent's estate until the certificates are divided on the BB&T corporate records between the [T]rust and the decedent's estate and dividend checks are issued accordingly.

4. The assets of . . . Washburn not transferred to the Trust are assets of the decedent's estate.

The record also contains a power of attorney issued by Washburn to allow Scruggs to act, *inter alia,* as her agent with respect to her banking transactions, tax matters, personal affairs, estate transactions, and gifts to charities.

---

The issues are whether: (I) the stock certificates, household furnishings, and appliances were properly conveyed to the Trust and thus became trust assets and (II) the deposit of funds into the Trust account by Scruggs as Washburn's power of attorney was proper.

I

By definition, the creation of a trust must involve a conveyance of property, and before property can be said to be held in trust by the trustee, the trustee must have legal title. . . . Aside from the situation in which a settlor of a trust declares himself or herself trustee, separation of the legal and equitable interests must come about through a transfer of the trust property to the trustee.

90 C.J.S *Trusts* § 68, at 193-94 (2002) (footnotes omitted). Accordingly, "the owner must surrender control of the property which he or she has subjected to the alleged trust." 90 C.J.S. *Trusts* § 70, at 196; *see also Wescott v. Bank,* 227 N.C. 39, 42, 40 S.E.2d 461, 463 (1946) ("there must be a transfer of the title by the donor or settl[o]r for the benefit of another"); *Baxter v. Jones,* 14 N.C. App. 296, 307, 188 S.E.2d 622, 628 (1972) (citation omitted) (" '[i]n order to create an enforceable trust it is necessary that the donor or creator should part with his interest in the property to the trustee by an actual conveyance or transfer, and, where the creator has legal title, that such title should pass to the trustee' "). "[I]f the owner of prop-

erty makes a conveyance inter vivos of the property to another person to be held by him in trust for a third person and the conveyance is not effective to transfer the property, *no trust of the property is created.*" Restatement (Second) of Trusts § 32 (1959) (emphasis added).

### BB&T Stock

[1] The trustees and the estate claim the trial court erred by failing to assign both stock certificate No. BBT080224 (Certificate 1) *and* stock certificate No. BBT093753 (Certificate 2) to them. The trustees, in support of their position, contend that the "Assignment of Assets" executed contemporaneously with the Trust was sufficient to transfer both stock certificates to the Trust. We disagree.

In order to determine the proper transfer of legal title to a security, we must look to Article 8 of the Uniform Commercial Code governing investment securities. Under Article 8, "a valid transfer of a certificated security requires both the indorsement and delivery of the certificate by its holder to the transferee." *Tuckett v. Guerrier*, 149 N.C. App. 405, 410, 561 S.E.2d 310, 313 (2002) (citing N.C.G.S. §§ 25-8-301, -304 (1999)); *see* Russell M. Robinson, II, *Robinson on North Carolina Corporation Law* § 10.10, at 10-26 (7th ed. 2002) [hereinafter *Robinson*] ("[t]he title to a share certificate, and to the shares represented thereby, is normally transferred by the delivery of the certificate to the transferee, either duly endorsed or with a separate document containing a written assignment or a power of attorney to transfer the shares"). An " '[i]ndorsement' means a signature that alone or accompanied by other words is made on a security certificate in registered form or on a separate document for the purpose of assigning, transferring, or redeeming the security." N.C.G.S. § 25-8-102(a)(11) (2001). Delivery, in turn, "occurs when: (1) [t]he [transferee] acquires possession of the security certificate; [or] (2) [a]nother person . . . acquires possession of the security certificate on behalf of the [transferee]." N.C.G.S. § 25-8-301(a)(1)-(2) (2001).

In this case, the parties do not contest that Washburn indorsed Certificate 1 by signing it and designating the "Vera Y. Washburn Trust Fund c/o Jerry R. Scruggs and John W. Cabiness, Trustees" as transferee in the allotted space on the certificate. The evidence is also clear that Certificate 1 was delivered to the trustees before Washburn's death. The estate nevertheless contends that because Washburn's signature was not guaranteed as required to transfer the

stock on the corporate books, the transfer was not complete and could therefore not serve to create a trust in that stock. This argument is of no avail.

"A registration of . . . a [stock] transfer on the stock transfer books of the corporation is not necessary to complete the transfer of title." *Robinson* § 10.10, at 10-26. It simply means that "until the transfer is recorded on the stock transfer books, the corporation can treat the record holder as the true owner of the shares." *Id.*; *see also* N.C.G.S. § 25-8-306 (2001) (a guarantee merely warrants that the signature is genuine and that the person signing is the appropriate person to indorse the certificate and has the legal capacity to sign). Thus, in accordance with the statutory requirements for a valid transfer, the trustees acquired legal title of Certificate 1 when Washburn signed it over to the Trust and delivered it to the trustees. *See Wescott,* 227 N.C. at 42, 40 S.E.2d at 463; *Tuckett,* 149 N.C. App. at 410, 561 S.E.2d at 313. Certificate 2, on the other hand, which was not found until after Washburn's death, was neither indorsed nor delivered to the trustees. Under these circumstances, there was no transfer of legal title to Certificate 2 by Washburn to the trustees and the asset belongs to the estate. Therefore, the trial court did not err in distributing Certificate 1 to the Trust and Certificate 2 to the estate and dividing the respective dividends accordingly.

### Household Furniture and Appliances

[2] The estate next contends the trial court erred in assigning to the Trust Washburn's furniture and appliances, items that remained in her possession until her death.

As discussed above, in order to create a valid trust in certain property, there must be a transfer of legal title by the settlor to the trustee. *See Wescott,* 227 N.C. at 42, 40 S.E.2d at 463. Generally, this can be accomplished by either "actual delivery of the . . . property or of a legal assignment thereof to the trustee, with the intention of passing legal title to him or her as trustee." 90 C.J.S. *Trusts* § 70, at 197. In the case of securities, our statutes define the proper method of conveying legal title. With respect to personal property such as furniture and appliances, however, there are no statutory guidelines to follow. Thus, we are solely guided by the intent of the parties. *Callaham v. Newsom,* 251 N.C. 146, 149, 110 S.E.2d 802, 804 (1959) ("[w]hen called upon to interpret a trust agreement or other contract, courts seek to ascertain the intent of the parties and, when ascertained, give effect thereto, unless forbidden by law").

IN RE ESTATE OF WASHBURN

[158 N.C. App. 457 (2003)]

We hold that in this case the "Assignment of Assets" was suffi-cient as a legal assignment of Washburn's furniture and appliances to the trustees. *See* 90 C.J.S. *Trusts* § 70, at 197. Furthermore, Washburn's retention of possession of the items during her lifetime was not inconsistent with the intention to pass legal title as the Trust provided that the income and/or principal were to be used for Washburn's benefit during her lifetime. The trial court therefore did not err in assigning the furniture and appliances to the Trust.

## II

[3] Finally, the estate argues the trial court erred in concluding that all funds deposited in the Trust account prior to Washburn's death belonged to the Trust because $10,507.32 of these funds were deposited in violation of the power of attorney granted by Washburn to Scruggs. The deposits at issue consist of $10,038.32 in funds from SouthTrust Bank accounts Scruggs closed for Washburn and a $469.00 tax refund. The estate contends that these deposits exceeded the scope of Scruggs' power of attorney because the document did not authorize transfers to the Trust. We disagree.

"A power of attorney is an instrument in writing granting power in an agent to transact business for his principal." *Cabarrus Bank & Trust Co. v. Chandler*, 63 N.C. App. 724, 726, 306 S.E.2d 184, 185 (1983). Thus, "an agent is a fiduciary only pertaining to matters within the scope of his agency." *In re Will of Sechrest*, 140 N.C. App. 464, 472, 537 S.E.2d 511, 517 (2000). The power of attorney executed by Washburn specifically grants Scruggs the authority to act on Washburn's behalf with respect to her banking transactions and tax matters, and the transfers and deposits clearly constituted banking transactions. In addition, the designation of the funds to the Trust involved gifts to charities as the beneficiaries of the Trust were churches. Consequently, the deposits fell within the scope of the power of attorney.

[4] The estate further contends that an agent cannot transfer the principal's assets to a trust under a power of attorney and thereby change the dispositive provisions of the principal's will. The estate bases its argument on a 1977 article that engaged in a hypotheti-cal discussion of an agent's powers based on an agent's lack of authority to create, alter, or revoke a principal's will. *See* William S. Huff, *The Power of Attorney—Durable and Nondurable: Boon or Trap*, Eleventh Annual Institute on Estate Planning 3-1, 3-10 (1977). This article, however, bears no weight on our analysis in light of

the binding precedent established by this Court "permit[ting] the conveyance of property which would comprise the estate under a will without revoking or altering that will." *Duncan v. Duncan*, 147 N.C. App. 152, 156-57, 553 S.E.2d 925, 928 (2001) (where the testator had entered an enforceable agreement not to revoke or alter her will and subsequently deeded away the property to be disposed of under the will, there was no breach of the agreement not to revoke or alter the will), *disc. review denied*, 355 N.C. 211, 559 S.E.2d 800 (2002); *see also* N.C.G.S. § 31-5.6 (2001) ("[n]o conveyance . . . made or done subsequently to the execution of a will of, or relating to, any real or personal estate therein comprised, . . . shall prevent the operation of the will with respect to any estate or interest in such real or personal estate *as the testator shall have power to dispose of by will at the time of his death*") (emphasis added). Accordingly, Scruggs was permitted to transfer the assets to the Trust under the power of attorney and the trial court did not err in concluding that all funds deposited in the Trust account prior to Washburn's death belonged to the Trust.

Affirmed.

Chief Judge EAGLES and Judge LEVINSON concur.