Willard v. Barger, 2020 NCBC 72.

STATE OF NORTH CAROLINA

COUNTY OF DAVIE

CHARLES WILLARD and TRACY
BARNES BLIMP WORKS, LLC,

               Plaintiffs,

v.

WILLIAM BARGER, individually;
WILLIAM BARGER AS EXECUTOR
OF THE ESTATE OF TRACY
BARNES; and BLIMP WORKS, INC.,

               Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 182

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO DISMISS
NOTICE OF LIS PENDENS,
PLAINTIFFS' MOTIONS FOR
PARTIAL SUMMARY JUDGMENT,
AND DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

1. The above-captioned case arises from a falling out between the co-owners of Tracy Barnes Blimp Works, LLC ("TBBW" or the "LLC")—Charles Willard ("Willard") and Tracy Barnes ("Barnes"). At issue are the actions Barnes—and after his death, his estate's executor, William Barger ("Barger")—took to operate TBBW's business, a company owned 40% by Barnes, through Blimp Works, Inc. ("BWI"), a North Carolina corporation owned 100% by Barnes.

2. Before the Court are four motions (collectively, the "Motions"):[1]

    a. Plaintiffs Willard and TBBW's Motion for Partial Summary Judgment as to the Counterclaims, for a Declaration that TBBW Owns the Subaru

---

[1] The Court held a hearing on the Motions on February 20, 2020 (the "Hearing"), at which all parties were represented by counsel, and the Motions are now ripe for resolution. The Court also noticed for hearing and heard arguments at the Hearing concerning Plaintiffs' Motion to Shift Receiver Costs and for Further Sanctions (the "Cost Shifting Motion") filed January 15, 2020. (ECF No. 106.) The Court elects to decide by separate order the Cost Shifting Motion and other related requests for attorneys' fees and costs contained in certain of the other Motions.

and for Attorneys' Fees Associated with This Motion ("Plaintiffs' First Summary Judgment Motion") filed December 6, 2019, (ECF No. 73);[2]

b. Defendants Barger, individually, and as executor of the Estate of Tracy Barnes (the "Estate"), and BWI's Motion for Summary Judgment ("Defendants' Summary Judgment Motion") filed December 20, 2019, (ECF No. 78);

c. Plaintiffs' Motion for Partial Summary Judgment ("Plaintiffs' Second Summary Judgment Motion," together with Plaintiffs' First Summary Judgment Motion and Defendants' Summary Judgment Motion, the "Cross-Motions") filed January 3, 2020, (ECF No. 89); and

d. Defendants' Motion to Dismiss Notice of Lis Pendens Filed by TBBW on January 6, 2020 ("Motion to Dismiss Notice of Lis Pendens") filed January 9, 2020, (ECF No. 97).[3]

3. Having considered the Motions, the briefs and related materials in support of and in opposition to the Motions, the arguments of counsel at the hearing on the

---

[2] On January 9, 2020, Defendants voluntarily dismissed with prejudice their second counterclaim seeking recovery of Barnes's alleged loans to TBBW ("Counterclaim 2"). (ECF No. 96.)

[3] TBBW initially filed the Notice of Lis Pendens in Iredell County on December 6, 2019, (Mot. Dismiss Lis Pendens Ex. 1, ECF No. 85; Notice Lis Pendens, ECF No. 93), but did not file the Notice on the North Carolina Business Court's ("NCBC") electronic docket at that same time. TBBW represents that it also filed the Notice of Lis Pendens in Davie County on an unidentified date. (Resp. Br. Defs.' Mot. Dismiss Lis Pendens 2, ECF No. 111.) On December 31, 2019, Defendants filed a motion to dismiss the Notice of Lis Pendens. (ECF No. 85.) After TBBW subsequently filed the Notice of Lis Pendens on the NCBC electronic docket on January 6, 2020, (ECF No. 93), Defendants moved again to dismiss the Notice of Lis Pendens on January 9, 2020, (ECF No. 97), effectively mooting their prior motion.

Motions, and other appropriate matters of record, the Court decides the Motions as set forth below.

*Fitzgerald Litigation, by Andrew Fitzgerald and Stuart Punger, for Plaintiff Charles Willard.*

*Bennett & Guthrie, PLLC, by Jasmine Pitt, for Plaintiff Tracy Barnes Blimp Works, LLC.*

*Eisele Vogel Dixon, PLLC, by Douglas G. Eisele, for Defendants William Barger, Individually, William Barger as Executor of the Estate of Tracy Barnes, and Blimp Works, Inc.*

Bledsoe, Chief Judge.

## I.

## DEFENDANTS' MOTION TO DISMISS NOTICE OF LIS PENDENS

4. The Court does not make findings of fact on motions to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("Rule(s)"), but instead only recites those facts included in the Complaint relevant to the Court's determination of the Motion.

5. Dismissal under Rule 12(b)(6) is proper when, viewing the allegations of the complaint in the light most favorable to the plaintiff and taking those allegations as true, "(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615, 821 S.E.2d 729, 736–37 (2018) (quoting *Wood v. Guilford Cty.*, 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002)). "[T]he complaint is to be liberally construed, and the trial court should not

dismiss the complaint unless it appears beyond doubt that [the] plaintiff could prove no set of facts in support of his claim which would entitle him to relief." *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 444, 666 S.E.2d 107, 116 (2008) (quoting *Meyer v. Walls*, 347 N.C. 97, 111–12, 489 S.E.2d 880, 888 (1997)).

6.      Plaintiffs filed the Complaint initiating this action on April 1, 2019, (Compl., ECF No. 3), and TBBW filed the Notice of Lis Pendens in Iredell County on December 6, 2019, (Mot. Dismiss Lis Pendens Ex. 1; Notice Lis Pendens).  TBBW represents that it also filed the Notice of Lis Pendens in Davie County on an unidentified date.  (Resp. Br. Defs.' Mot. Dismiss Lis Pendens 2.)  On January 6, 2020, TBBW filed the Notice of Lis Pendens on the NCBC electronic docket, asserting that, through this lawsuit, TBBW seeks title to and possession of land currently titled to the Estate.  (Notice Lis Pendens.)

7.      Under North Carolina law, a notice of lis pendens may only be filed in actions directly "affecting title to real property."  N.C.G.S. § 1-116(a)(1); *see also George v. Admin. Office of the Courts*, 142 N.C. App. 479, 483, 542 S.E.2d 699, 702 (2001) ("Notice of *lis pendens* may not properly be filed except in an action, a purpose of which is to affect *directly* the title to the land in question or to do one of the other things mentioned in the statute." (quoting *Cutter v. Cutter Realty Co.*, 265 N.C. 664, 668, 144 S.E.2d 882, 885 (1965))); *Miller & Long, Inc. v. Intracoastal Living, LLC*, NO. COA09-671, 2010 N.C. App. LEXIS 582, at *6 (N.C. Ct. App. Apr. 6, 2010) ("A lis pendens is properly filed only where a party is asserting an interest in real property." (citing N.C.G.S. § 1-116(a))).  "In determining whether a cause of action affects title

to real property . . . , the nature of the action must be analyzed by reference to the facts alleged in the body of the complaint rather than by what is contained in the prayer for relief." *George*, 142 N.C. App. at 483, 542 S.E.2d at 702.

8.       Defendants have moved to dismiss the Notice of Lis Pendens on the ground that Plaintiffs have failed to allege a claim affecting title to real property. (Defs.' Br. Supp. Mot. Dismiss Lis Pendens ¶ 6, ECF No. 98.) Both sides focus their arguments on Count 9 of the Complaint to support their positions. Count 9 provides, in relevant part, that "Barnes agreed and formed a contract with Willard . . . to transfer his 40% remaining interest in TBBW at death to Willard" and that "Barnes breached his contract with Willard by amending his will and/or testamentary trust to instead transfer any interest in TBBW to Barger." (Compl. ¶¶ 86, 88.)

9.       Although TBBW contends to the contrary, a review of Count 9's language, as well as a review of the other allegations of the Complaint, establishes that Plaintiffs base their claims and requested relief on Barnes's interest in TBBW. They do not seek to transfer or otherwise directly affect the Estate's title to any *real property* through the claims asserted in the Complaint. As such, North Carolina law requires that the Court grant Defendants' motion and cancel the Notice of Lis Pendens. *See* N.C.G.S. § 1-120 (providing for cancellation of notice of lis pendens); *Cutter*, 265 N.C. at 669, 144 S.E.2d at 885 (recognizing a trial court's jurisdiction to cancel improperly filed notice of lis pendens before termination of the action).

II.

CROSS-MOTIONS FOR SUMMARY JUDGMENT

A.    Factual and Procedural Background

10.    The Court does not make findings of fact on motions for summary judgment; rather, the Court summarizes material facts it considers to be uncontested. *See, e.g.*, *Vizant Techs., LLC v. YRC Worldwide, Inc.*, 373 N.C. 549, 551, 838 S.E.2d 616, 617 (2020).

11.    Barnes founded and began operating BWI in Iredell County, North Carolina in 1985.  BWI's business involved making blimps and balloons and providing related goods and services.  (Compl. ¶ 8; Ans., Further Defenses & Countercls. ¶¶ 7–8 [hereinafter "Ans."], ECF No. 6.)  Barnes was BWI's sole shareholder.  (Aff. Charles Willard [hereinafter "2nd Willard Aff."] Ex. 4 Ownership Transition Agreement 1 [hereinafter "OTA"], ECF No. 89.1.)

12.    In 2012, Barnes and Willard formed TBBW as a North Carolina limited liability company to engage in the same business as BWI.  As Barnes and Willard later agreed, "on January 1st, 2012, BWI transferred all of its operations and assets pertaining to the design, manufacture and sale of utility and advertising blimps, balloons and hot air balloons (the "Business") to [TBBW], which was at that time a wholly-owned subsidiary of BWI[.]"  (2nd Willard Aff. Ex. 4 OTA 1.)  Thereafter, TBBW operated BWI's former business from BWI's Iredell County location, (Aff. William Barger 1, ECF No. 102), and BWI became inactive, save for work on a single

airship project, (Aff. Charles M. Willard ¶ 3 [hereinafter "1st Willard Aff."], ECF No. 73.2; Barger Dep. 31, ECF No. 89.2).

13.     Barnes and Willard entered into agreements in 2014 regarding the structure, management, ownership, and operation of TBBW.[4]  By that time, BWI owned 80% of TBBW and Willard owned the remaining 20%. (2nd Willard Aff. Ex. 4 OTA 1.)  These 2014 agreements contemplated Barnes's eventual departure from the business and Willard's resulting increased ownership.  Barnes and Willard agreed to a transition period during which BWI's entire ownership interest in TBBW would be transferred to Barnes and Willard would acquire an increasingly greater interest in TBBW from Barnes[5] so that Willard would own 51% of TBBW by January 1, 2017 and 60% by January 1, 2018.  (2nd Willard Aff. Ex. 3 Am. & Restated Employment Agreement § 3(b)(i)(D).)

14.     The plan proceeded as agreed, and by March 2018, TBBW was owned 60% by Willard and 40% by Barnes.  (2nd Willard Aff. Ex. 3 Amended & Restated Employment Agreement § 3(b)(i)(E).)  At that time, however, the relationship between Barnes and Willard deteriorated, (1st Willard Aff. ¶ 15; Barger Dep. 31:22–32:22), and Barnes told Willard he no longer wanted to work with him, (Compl. ¶ 15; Ans. ¶ 15).  Willard thereafter stopped working from TBBW's offices.  (Aff. Charles

---

[4] These agreements included (i) an Amended and Restated Operating Agreement, (ii) an Amended and Restated Employment Agreement, and (iii) the OTA. (*See* 2nd Willard Aff. Ex. 2 Am. & Restated Operating Agreement, ECF No. 89.1; 2nd Willard Aff. Ex. 3 Am. & Restated Employment Agreement, ECF No. 89.1; 2nd Willard Aff. Ex. 4 OTA.)

[5] (*See* 2nd Willard Aff. Ex. 4 OTA 1 ("Barnes believes it to be in his best interest and the best interest of BWI and [TBBW] to provide a transition method whereby Willard may acquire additional membership interest of [TBBW] over a period of time[.]").)

Willard ¶¶ 12–15 [hereinafter "3rd Willard Aff."], ECF No. 21.1; Barger Dep. 32:19–22, 37:17–20.) Willard remained a TBBW employee and TBBW's majority owner and remains so today. (1st Willard Aff. ¶ 15; 2nd Willard Aff. ¶¶ 8–9; Barger Dep. 31:22–32:4, 37:17–20.)

15. After operating TBBW for several months without Willard's active participation, Barnes called a meeting of TBBW's employees (other than Willard) in the summer of 2018 and announced that TBBW's operations, including "the retail, the blimps, [and] the web orders[,]" would no longer be conducted through TBBW (of which Barnes owned 40%) and instead would continue through BWI (of which Barnes owned 100%). (Barger Dep. 33:17–34:21; 44:20–45:17, 181:13–24.) There is no evidence that Barnes notified or sought or obtained approval or consent from either Willard or the TBBW board of directors for these actions.

16. Beginning in July 2018, BWI assumed TBBW's business operations as its own, including TBBW's opportunities and resulting revenue streams, without TBBW's consent and without payment to TBBW.[6] (1st Willard Aff. ¶ 8; Barger Dep. 34:22–35:8, 190:10–191:12.) Not surprisingly, BWI, which had been essentially dormant since 2012, saw its revenues dramatically increase as it began receiving the revenues that had formerly been earned by and paid to TBBW. (Barger Dep. 44:11–20.) At the same time, Barnes terminated TBBW's operations, again without notice to or the approval or consent of Willard or the TBBW board, which resulted in an immediate and catastrophic decline in TBBW's revenues. (Barger Dep. 44:3–10.)

---

[6] For example, TBBW's employees started receiving their paychecks from BWI in October 2018. (Barger Dep. 135:1–4.)

TBBW's revenues ceased entirely after September 2018, (Barger Dep. 83:2–9), and, in December 2018, Barnes closed TBBW's bank account, (Barger Dep. 8:11–16).

17. In December 2018, Barnes became terminally ill, (Barger Dep. 57:6–7), and died on January 20, 2019, (Aff. 1 [hereinafter "Barger Aff."], ECF No. 113). After Barnes's death, Barger, then a TBBW employee who worked closely with Barnes following Barnes's falling out with Willard, became the executor of the Estate and took over the management of BWI. (Barger Dep. 57:2–59:4, 185:23–25, Ex. 4.) BWI ceased all operations on May 31, 2019. (Barger Dep. 18:20–19:10.) As a result, neither TBBW nor BWI now has ongoing operations. (Report Court-Appointed Receiver, at Items 5–6 [hereinafter "Final Report"], ECF No. 75.)

18. Plaintiffs filed this action on April 1, 2019, alleging that Barnes contracted to leave his 40% ownership interest in TBBW to Willard upon Barnes's death but failed to do so and that Defendants fraudulently conveyed the assets of TBBW to BWI before Barnes's death without consideration to TBBW. (Compl. ¶¶ 21–22, 86.) Based on these allegations, Plaintiffs assert claims for fraudulent conveyance, conversion, breach of contract, breach of fiduciary duty, parol trust/tracing of assets/equitable lien/unjust enrichment, unfair and deceptive trade practices, attorneys' fees and costs, and tortious interference with contract. (Compl. ¶¶ 33–98.)

19. Shortly after the action commenced, on May 23, 2019, Willard moved for the appointment of a receiver to determine the remaining assets of TBBW and BWI. (ECF No. 21.) The Court granted Willard's motion by Order dated July 1, 2019 (the "Appointment Order") and appointed Bert Davis, Jr., CPA ("Davis" or the "Receiver")

as receiver for TBBW and BWI (the "Companies"). (Order Pl. Willard's Mot. Appointment Receiver ¶ 6(a) [hereinafter "Appointment Order"], ECF No 50.)

20. In the Appointment Order, the Court directed Davis to take possession, custody, and control of the Companies' assets and conduct a current inventory. (Appointment Order ¶ 6(g)(iv)–(v).) Additionally, the Court directed Davis to "provide promptly an accounting of each Company's business activities since January 1, 2017, such accounting to include an investigation and determination concerning whether assets of either Company were transferred, the identity of the recipients of any such transfers, and whether fair value was received for any such transfers." (Appointment Order ¶ 6(g)(vi).) The Court also required Davis to file monthly status reports regarding the current inventory of each Company's assets, the accounting of each Company's business activities, and Davis's best assessment of the continued viability of each Company as a going concern. (Appointment Order ¶ 6(g)(vii).)

21. Davis accepted his appointment as Receiver on July 8, 2019, (ECF No. 54), and thereafter submitted monthly status reports to the Court concerning his investigation and forensic activities, (ECF Nos. 57, 60 (under seal), 63 (public), 65–66 (public), 71 (public)), followed by a final report, (ECF No. 75). Based on the Receiver's initial work, later confirmed in his final report, the Receiver determined that neither TBBW nor BWI was viable as an operating business. (Final Report, at Item 6.)

22. The Receiver filed his final report on December 18, 2019 and was discharged from further service. (ECF Nos. 75, 82.) Both parties attach significance

to the Receiver's findings in his final report in advancing and defending against the Cross-Motions.

23. For their part, Plaintiffs point to the Receiver's conclusions that, beginning in July 2018 and before Barnes's death in January 2019, "revenues totaling $174,068 which had been flowing into TBBW for several years were diverted to BWI, presumably by Mr. Barnes[,]" (Final Report, at Item 3), and that "[g]iven that Mr. Barnes was no longer the majority owner of TBBW at the time, the legality of this diversion is questionable[,]" (Final Report, at Item 3).

24. Defendants, in contrast, rely upon the Receiver's acknowledgements that he could not conclude whether various physical assets belonged to TBBW or BWI, as the assets had been intermingled, or whether assets, other than inventory, had been transferred from or between the Companies, (Final Report, at Item 4), due to the broad and vague asset listing provided by the Companies' CPA, (Final Report, at Items 2, 4). Defendants also highlight the Receiver's conclusions concerning sales to a company called Arizona Balloons. While the Receiver determined that $6,400 of the sale proceeds for "raw materials inventory" sold to Arizona Balloons was deposited into BWI's bank account, the Receiver also noted that "[d]ue to the nature of the accounting records of TBBW and BWI, it is not possible to determine which company owned the inventory." (Final Report, at Item 5.)

B. Legal Standard

25. Under Rule 56, "summary judgment is appropriate where 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.' " *Cabarrus Cty. Bd. of Educ. v. Dep't of State Treasurer*, 374 N.C. 3, 17, 839 S.E.2d 814, 823–24 (2020) (quoting N.C. R. Civ. P. 56(c)). "An issue is 'genuine' if it can be proven by substantial evidence and a fact is 'material' if it would constitute or irrevocably establish any material element of a claim or a defense." *Lowe v. Bradford*, 305 N.C. 366, 369, 289 S.E.2d 363, 366 (1982). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference[.]" *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681, 565 S.E.2d 140, 146 (2002) (citations and internal quotation marks omitted). The Court must view all evidence "in a light most favorable to the nonmoving party[.]" *Id.* at 682, 565 S.E.2d 146 (quoting *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001)).

26. The moving party bears the burden of showing that there is no genuine issue of material fact. *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579, 573 S.E.2d 118, 124 (2002). The moving party may meet this burden either: "(1) 'by proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense'; or (2) 'by showing through discovery that the opposing party cannot produce evidence to support an essential element of [its] claim.' " *Strickland v. Lawrence*, 176 N.C. App. 656, 661, 627 S.E.2d 301, 305 (2006) (quoting *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000)). If the moving party meets its burden, "the burden shifts to the

nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784–85, 534 S.E.2d 660, 664 (2000); *see also* N.C. R. Civ. P. 56(e) ("[A]n adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.").

C.    Cross-Motions: Counts 1–3: Fraudulent Conveyance[7]

27.    Both parties moved for summary judgment on Plaintiffs' fraudulent conveyance claims. Plaintiffs bring those claims under N.C.G.S. §§ 39-23.4(a)(2) (transfer or obligation voidable as to present or future creditor) and 39-23.5(a) (transfer or obligation voidable as to present creditor).[8] A necessary element of each is that a fraudulent transfer has occurred. Plaintiffs argue that they have satisfied this element and are entitled to judgment as a matter of law, contending that the undisputed evidence shows that Defendants fraudulently transferred "everything TBBW owned, such as accounts receivable, goodwill, the ongoing concern of TBBW's operation, tools, customer contacts, a web site, and equipment" to BWI. (Br. Supp. Pls.' Mot. Partial Summ. J. 7 [hereinafter "Pls.' Br. Supp."], ECF No. 90.) Defendants

---

[7] Plaintiffs' Second Summary Judgment Motion puts at issue Counts 1 (fraudulent conveyance to defraud Willard) and 3 (declaration that conveyance was fraudulent). The Court also addresses Count 2 (fraudulent conveyance to defraud TBBW) because Defendants addressed all of Plaintiffs' "fraudulent conveyances claims" in their Summary Judgment Motion.

[8] Defendants do not dispute that TBBW and Willard are creditors under these statutes, which are each part of the Uniform Voidable Transactions Act ("UVTA") as adopted in North Carolina, N.C.G.S. § 39-23.1 *et seq.*

argue in opposition that neither Plaintiffs nor the Receiver were able to provide evidence that any TBBW assets were fraudulently transferred, including earned revenues that the Receiver claimed were "diverted" from TBBW to BWI, (Defs.' Br. Resp. Pls.' Br. Supp. Pls.' Mot. Partial Summ. J. 10–11, ECF No. 112; Defs.' Br. Supp. Mot. Summ. J. 14–15, ECF No. 79), and that the dismissal of Plaintiffs' fraudulent conveyance claims must necessarily follow.

28. With the exception of a single intangible asset discussed below, the Court agrees with Defendants. Plaintiffs have not offered evidence, either through the Receiver's investigation or otherwise, that either establishes, or otherwise permits a reasonable factfinder to conclude, that assets of TBBW were transferred to BWI or to some other person or entity. Indeed, the Receiver's investigation concluded that the assets were so intermingled between TBBW and BWI, and the accounting records were so vague and unclear, that it was impossible to determine whether assets ever belonged to TBBW or BWI and thus whether any of those assets were ever transferred from TBBW, fraudulently or otherwise. (*See* Final Report, at Item 2 ("independently identifying the companies' assets is not possible"), Item 5 ("it is not possible to determine which company owned the inventory").) Because Plaintiffs' fraudulent conveyance claims are unsupported by evidence from either the Receiver's investigation or some other source that permits a factfinder to conclude that Defendants transferred TBBW's assets, the Court concludes that Plaintiffs' fraudulent conveyance claims must be dismissed, except to the extent provided below.

29.     The single exception concerns Plaintiffs' fraudulent conveyance claims to the extent they are based on Barnes's transfer of TBBW's good will to BWI in July 2018.   Good will is defined as "a property right which consists of intangibles associated with favorable community relations and identification of the business name[,]" and it "is an asset capable of being fraudulently conveyed[.]"  *Budd Tire Corp. v. Pierce Tire Co.*, 90 N.C. App. 684, 688, 690, 370 S.E.2d 267, 270–71 (1988); *see also, e.g., Newark Morning Ledger Co.* v. *United States*, 507 U.S. 546, 556 (1993) (holding good will encompasses "the total of all the imponderable qualities that attract customers to the business"); *Stoumbos v. Kilimnik*, 988 F.2d 949, 963 (9th Cir. 1993) ("Good will is an intangible element that inheres in the value of a going business."); *L. J. Best Furniture Distribs., Inc. v. Capital Delivery Serv., Inc.*, 111 N.C. App. 405, 409, 432 S.E.2d 437, 440 (1993) (finding in fraudulent transfer analysis that a company's good will may have been acquired where the receiving company served "at least one, and maybe several of the same customers that [the company] had previously serviced").

30.     The undisputed evidence here shows that Barnes announced in or about July 2018 that TBBW's business would from then on be conducted through BWI. (Barger Dep. 33:17–34:21, 44:20–45:17, 181:13–24.)  As Barger explained, "[i]t was a simple matter of one company's owner [Willard] disappeared, the company [TBBW] ceased to exist, so the original company [BWI] continued in its place."  (Barger Dep. 136:19–22.)

31. While Plaintiffs' evidence of transfer otherwise fails because it is insufficient to show Plaintiffs' ownership of the assets prior to their alleged transfer, no such uncertainty or dispute exists concerning the ownership of TBBW's good will or Barnes's transfer of that good will to BWI. Indeed, it is undisputed that Barnes shut down the TBBW business in July 2018 and immediately and seamlessly continued through BWI that very same business in the very same building with the very same employees, equipment, inventory, customers, opportunities, and methods of doing business as TBBW without Willard's or TBBW's approval or consent and without compensation to TBBW of any kind. (Barger Dep. 33:17–34:21, 44:16–45:17, 181:13–24.) The undisputed evidence therefore shows as a matter of law that Barnes transferred TBBW's good will to BWI.

32. Having reached this conclusion, the Court next determines whether Plaintiffs are entitled to judgment on the liability portion of their fraudulent conveyance claims to this extent.

33. Section 39-23.4(a) concerns present and future creditors and provides:

(a) A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) With intent to hinder, delay, or defraud any creditor of the debtor; or

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

a. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

b. Intended to incur, or believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

N.C.G.S. § 39-23.4(a).

34.     Section 39-23.5 concerns only present creditors and applies where the debtor "made the transfer 'without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.' " *Estate of Hurst v. Jones*, 230 N.C. App. 162, 169, 750 S.E.2d 14, 19 (2013) (quoting N.C.G.S. § 39-23.5).

35.     Both sections require that a "[t]ransfer" involve "[p]roperty of a debtor[.]" *See* N.C.G.S. §§ 39-23.1(2), (10), (12); *see also* N.C.G.S. § 39-23.1 Official Comment (defining "property" to "include[ ] both real and personal property, whether tangible or intangible, and any interest in property, whether legal or equitable."). The UVTA clearly states that an "asset" is "[p]roperty of a debtor," N.C.G.S. §§ 23.1.(2), and our appellate courts have established that "[a]lthough it exists as an incident of other property rights, 'good will' is as much an 'asset' as equipment, machinery, or other tangible property[,]" *Budd Tire*, 90 N.C. App. at 688, 370 S.E.2d 270 (citation omitted). Accordingly, the Court concludes that TBBW's good will is "property of a debtor [TBBW]" under the UVTA.

36.     A "transfer" is defined very broadly under the UVTA to include "[e]very mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset and includes payment of money, release, lease, license, and creation of a lien or other encumbrance."

N.C.G.S. § 39-23.1(12); *see also, e.g.*, *KB Aircraft Acquisition, LLC v. Berry*, 249 N.C. App. 74, 80, 790 S.E.2d 559, 564 (2016) (noting UVTA's "all-inclusive" definition of "[t]ransfer"); *Estate of Chambers v. Vision Two Hosp. Mgmt., LLC*, 2013 NCBC LEXIS 49, at *15 (N.C. Super. Ct. Nov. 21, 2013) (noting UVTA's predecessor "UFTA's broad definition[ ] of . . . transfer" for "claims under UFTA sections 39-23.4(a) and 39-23.5"). The Court concludes that Barnes's undisputed actions in shutting down TBBW's business operations and continuing TBBW's business through BWI constitute a "transfer" of TBBW's good will to BWI under this expansive definition.

37. The undisputed evidence also shows that TBBW did not receive reasonably equivalent value (indeed, it received nothing) in exchange for Barnes's transfer of TBBW's good will to BWI. (*See* Barger Dep. 34:22–35:8, 190:10–191:12); *see also Gen. Fid. Ins. Co. v. WFT, Inc.*, 837 S.E.2d 551, 558 (N.C. Ct. App. 2020) (finding under section 39-23.5 that a company did not receive reasonably equivalent value when its assets and business were transferred without payment or any consideration). Likewise, the Receiver's findings establish as a matter of law that Barnes's transfer left TBBW with assets that were unreasonably small to conduct further business, (*see* Final Report, at Item 3, Ex. 2), and that TBBW became insolvent as a result of the transfer of its good will, (*see* Final Report, at Item 3 ("Prior to [BWI's continuation of TBBW's business], TBBW was slightly profitable on a cash flow basis.")). And Defendants admit that Willard's claim for unpaid salary arose before the alleged fraudulent transfer, making him a creditor of TBBW. (Ans. ¶ 17 ("These Defendants

do know that TBBW generated no profits in 2018 and was without income sufficient to pay Willard's compensation under his employment contract.").)

38.     Based on the undisputed evidence as outlined above and the legal conclusions arising therefrom, the Court concludes that Plaintiffs' Motion for Summary Judgment should be granted and judgment entered against the Estate and BWI as a matter of law as to their liability on Plaintiffs' fraudulent transfer claims under sections N.C.G.S. §§ 39-23.4(a)(2) and 39-23.5(a) to the extent those claims are based on Barnes's transfer of TBBW's good will to BWI.[9]  Except to this extent, however, Plaintiffs' fraudulent conveyance claims should be dismissed.

D.     Defendants' Summary Judgment Motion: Count 10: Tortious Interference with Contract[10]

39.     A required element of a claim for tortious interference with contract is that the defendant knows of the plaintiff's contract with a third party that the plaintiff contends the defendant has induced the third party not to perform. *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 368 N.C. 693, 700, 784 S.E.2d

---

[9] The Court enters judgment on Plaintiffs' fraudulent conveyance claims to this extent against the Estate and BWI because they were the beneficiaries of Barnes's transfer of TBBW's good will. *See* N.C.G.S. § 39-23.8(b)(1)(a) (providing for judgment against "[t]he first transferee of the asset or the person for whose benefit the transfer was made").  The Court does not enter judgment on these claims against Barger, individually, because Barger was neither the first transferee nor the beneficiary of the transfer. *See Global Textile All., Inc. v. TDI Worldwide, LLC*, 2018 NCBC LEXIS 159, at *36 n.2 (N.C. Super. Ct. Nov. 29, 2018) (denying relief against defendants not parties to the transaction/obligation).

[10] Although Defendants indicate they seek summary judgment on "all claims," (Defs.' Mot. Summ. J. 2, ECF No. 78; Defs.' Br. Supp. Mot. Summ. J. 13), the only arguments Defendants advanced in their brief and at the Hearing concerned Plaintiffs' claims for fraudulent transfer and tortious interference with contract.  Nevertheless, the Court considers Defendants' contention that all of Plaintiffs' claims should be dismissed in considering Plaintiffs' motions for summary judgment. *See* N.C. R. Civ. P. Rule 56(c) ("[W]hen appropriate, [summary judgment] may be rendered against the moving party.").

457, 462 (2016) (quoting *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988)). TBBW alleges that Barger tortiously interfered with Barnes's agreement to transfer his 40% interest in TBBW to Willard at death. (Compl. ¶¶ 94, 96.) Defendants contend that Plaintiffs have offered no evidence that Barger knew of Willard's contract with Barnes, requiring dismissal. (Defs.' Br. Supp. Mot. Summ. J. 16.) Plaintiffs conceded in their response brief "that through discovery no strong evidence of Count 10 has emerged[,]" (Resp. Defs.' Mot. Summ. J. 4, ECF No. 91), and acknowledged at the Hearing that this claim should be dismissed for failure of proof, (Feb. 20, 2020 Hearing Tr. 47:10–16, ECF No. 125). The Court agrees and concludes that TBBW's claim for tortious interference with contract should be dismissed.

E.      Plaintiffs' Second Summary Judgment Motion (on Plaintiffs' Claims)

    1.      Count 4: Conversion

40.      Plaintiffs contend that Defendants' transfer of assets from TBBW to BWI constitutes conversion. (Pls.' Br. Supp. 11.) Under North Carolina law, "only goods and personal property are properly the subjects of a claim for conversion." *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 414, 537 S.E.2d 248, 264 (2000). As such, real property and intangible interests cannot properly be the subject of a conversion claim. *Id.*; *Window World of N. Atlanta, Inc. v. Window World, Inc.*, 2018 NCBC LEXIS 111, at *8–9 (N.C. Super. Ct. Oct. 22, 2018) ("[A]n intangible interest cannot provide the basis for a conversion claim."). Because the Court has previously concluded that the evidence of record shows that the only TBBW asset that

any Defendant has transferred is TBBW's good will—an intangible asset—Plaintiffs' conversion claim necessarily fails and must be dismissed. *See Norman*, 140 N.C. App. at 414, 537 S.E.2d at 264 (recognizing that business opportunities and expectancy interests cannot be subject to a conversion claim).

### 2. Count 5: Breach of Fiduciary Duty by Barnes

41. TBBW contends that Barnes breached his fiduciary duty to TBBW as a company official by acting to further his own interests, and not TBBW's, in transferring TBBW's assets to BWI. (Pls.' Br. Supp. 12–13.)

42. "To establish a claim for breach of fiduciary duty, a plaintiff must show that: (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to the plaintiff." *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 339, 828 S.E.2d 467, 475 (2019).

43. Under North Carolina's Limited Liability Company Act (the "LLC Act"), LLC managers and company officials owe fiduciary duties to the LLC. N.C.G.S. § 57D-3-21(b) ("Each manager shall discharge that person's duties (i) in good faith, (ii) with the care an ordinary prudent person in a like position would exercise under similar circumstances, and (iii) subject to the operating agreement, in a manner the manager believes to be in the best interests of the LLC."); *Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 474, 675 S.E.2d 133, 137 (2009) (noting that managers of an LLC owe a fiduciary duty to the LLC); *Timbercreek Land & Timber Co. v. Robbins*, 2017 NCBC LEXIS 64, at *12 (N.C. Super. Ct. July 28, 2017) (stating that company

officials owe the same duties as managers (citing N.C.G.S. § 57D-3-23)). Under the LLC Act, a "[c]ompany official" is "[a]ny person exercising any management authority over the limited liability company whether the person is a manager or referred to as a manager, director, or officer or given any other title." N.C.G.S. § 57D-1-03(5).

44.     It is undisputed that Barnes served as a manager of TBBW until Willard became TBBW's majority owner, (2nd Willard Aff. Ex. 3 Am. & Restated Operating Agreement Art. VI § 6.1(b), 20), and that Barnes served as a company official of TBBW at all times relevant to this litigation, (*see* ECF No. 116); *see also* TBBW's Business Registration listing Barnes as a company official on the N.C. Secretary of State's website at https://www.sosnc.gov/online_services/search/Business_ Registration_Results. Barnes therefore owed a fiduciary duty to TBBW during the period at issue in this lawsuit. *See* N.C.G.S. § 57D-3-23.

45.     It is hard for the Court to conceive of a more egregious breach of fiduciary duty than the undisputed evidence shows Barnes orchestrated here. As discussed at length above, it is undisputed that Barnes ceased operating the entity in which he was a 40% owner (TBBW) and shifted TBBW's business operations to BWI, a company he owned in its entirety, without Willard's or TBBW's approval or consent and without compensation to TBBW. In so doing, Barnes sought to benefit himself at the expense of TBBW and blatantly breached his fiduciary duty to TBBW. *See Meiselman v. Meiselman*, 309 N.C. 279, 307, 307 S.E.2d 551, 568 (1983) ("[A] corporate officer or director is under a fiduciary obligation not to divert corporate business opportunity for his own personal gain." (citation omitted)); *Brite v. Penny*,

157 N.C. 110, 115, 72 S.E. 964, 966 (1911) ("The law would not permit him to act in any such double capacity to appropriate business for himself belonging legitimately to his corporation and to reap the profits of it.").[11] In addition, because the undisputed evidence shows that Barnes caused TBBW to shutter its operations, Plaintiffs have also established that Barnes's breach of fiduciary proximately caused TBBW's injury as a matter of law.

46.     Accordingly, the Court concludes that Plaintiffs' motion for summary judgment should be granted and that judgment as to liability should be entered for TBBW and against the Estate on TBBW's claim for breach of fiduciary duty.

### 3.     Count 6: Parol Trust/Tracing of Assets/Equitable Lien/Unjust Enrichment

47.     Through Count 6 of their Complaint, Plaintiffs ask the Court "to establish an attachment or legal trust on the assets fraudulently conveyed, consistent with [N.C.]G.S. § 39-23.7(a)(2)." (Pls.' Br. Supp. 10.)  Good will, however—the only asset the record evidence shows has been fraudulently transferred by any Defendant—"as an asset having value, can exist only as appurtenant to or as an incident of a going

---

[11] The Supreme Court has identified six factors a court may consider in assessing whether a corporate opportunity has been usurped:

> 1) the ability, financial or otherwise, of the corporation to take advantage of the opportunity; 2) whether the corporation engaged in prior negotiations for the opportunity; 3) whether the corporate director or officer was made aware of the opportunity by virtue of his or her fiduciary position; 4) whether the existence of the opportunity was disclosed to the corporation; 5) whether the corporation rejected the opportunity; and 6) whether the corporate facilities were used to acquire the opportunity.

*Meiselman*, 309 N.C. at 310, 307 S.E.2d at 569.  Consideration of each of these factors compels the conclusion that Barnes breached his fiduciary duty by usurping TBBW's corporate opportunities here.

concern or operating business[.]" *Mossler Acceptance Co. v. Martin*, 322 F.2d 183, 185 (5th Cir. 1963), *cert. denied*, 376 U.S. 921 (1964); *see also Dodge Bros., Inc. v. United States*, 118 F.2d 95, 100 (4th Cir. 1941) ("Good will cannot be carved out of a business and sold independently of the going concern; for its tangibility and its value exist only to the extent that such tangibility and such value are connected with a going business.").

48.     Because it is undisputed that TBBW is no longer a going concern, (Final Report, at Items 5–6), TBBW's good will, as an asset having value, no longer exists and cannot be transferred.   As such, the equitable remedies Plaintiffs seek are unavailable to Plaintiffs as a matter of law.  *See Bissette v. Harrod*, 226 N.C. App. 1, 9, 738 S.E.2d 792, 799 (2013) ("[B]y definition, the creation of a trust must involve a conveyance of property[.]" (quoting *In re Estate of Washburn*, 158 N.C. App. 457, 461, 581 S.E.2d 148, 151 (2003))); *Tucker v. Miller*, 113 N.C. App. 785, 790, 440 S.E.2d 315, 318 (1994) ("Goodwill exists as property merely as an incident to other property rights, and is not susceptible of being owned and disposed of separately from the property right to which it is incident." (quoting *Ice Cream Co. v. Ice Cream Co.*, 238 N.C. 317, 321, 77 S.E.2d 910, 914 (1953))).[12]

---

[12] The Court also notes that Plaintiffs have a full and complete remedy at law through their claims for monetary relief, a further basis for dismissal of Plaintiffs' request for equitable relief in Count 6.  *See, e.g., Embree Constr. Grp., Inc. v. Rafcor, Inc.*, 330 N.C. 487, 491 (1992) ("[E]quity will not lend its aid in any case where the party seeking it has a full and complete remedy at law." (quoting *Jefferson Standard Life Ins. Co. v. Guilford Cty.*, 225 N.C. 293, 300, 34 S.E.2d 430, 434 (1945)); *KNC Techs., LLC v. Tutton,* 2019 NCBC LEXIS 72, at *39–40 (N.C. Super. Ct. Oct. 9, 2019) (declining to impose equitable relief where party could recover through its breach of contract, tortious interference, and UDTPA claims).

####### 4.    Count 9: Breach of Contract

49.    Plaintiffs allege through Count 9—discussed previously in connection with Defendants' Motion to Dismiss Notice of Lis Pendens—that the Estate breached Barnes's contract with Willard by failing to transfer Barnes's remaining ownership interest in TBBW to Willard upon Barnes's death. (Pls.' Br. Supp. 13–14; Compl. ¶ 86 ("Barnes agreed and formed a contract with Willard . . . as part of the agreements in 2011 and the 2014 transactions, to transfer his 40% remaining interest in TBBW at death to Willard."); Ans. ¶ 86 ("Defendants admit that the 2011 and 2014 transactions referred to in paragraph 86 contain the promise alleged in paragraph 86.").)[13]

50.    Under North Carolina law, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d, 838, 843 (2000).

51.    The OTA, provides, in relevant part, that: "Notwithstanding anything herein to the contrary, Barnes shall cause his last will and testament to reflect that upon his death, his estate shall immediately . . . (ii) transfer all of his membership interests in [TBBW] to Willard, free and clear." (2nd Willard Aff. Ex. 4 OTA § VI.1.)

---

[13] Plaintiffs also contend that they are entitled to an order transferring real property to TBBW in accordance with this same agreement. (Pls.' Br. Supp. 13–14; *see also* 2nd Willard Aff. Ex. 4 OTA § VI.1.)  Plaintiffs' contention fails, however, for the same reasons the Court advanced in granting Defendants' Motion to Dismiss Notice of Lis Pendens.  In addition, to the extent Plaintiffs are attempting to amend Count 9 or to assert a new claim for this relief at summary judgment, Plaintiffs' request is denied, in the exercise of the Court's discretion. *See Bradshaw v. Maiden*, 2020 NCBC LEXIS 106, at *19–20 (N.C. Super. Ct. Sept. 15, 2020) (declining to allow assertion of a new claim at summary judgment when the claim was not pleaded).

"In a contract dispute between two parties, the trial court may interpret a plain and unambiguous contract as a matter of law if there are no genuine issues of material fact." *Crescent Univ. City Venture, LLC v. AP Atl., Inc.*, 2019 NCBC LEXIS 46, at *30 (N.C. Super Ct. Aug. 8, 2019) (quoting *Premier, Inc. v. Peterson*, 232 N.C. App. 601, 605, 755 S.E.2d 56, 59 (2014)); *see also Walton v. City of Raleigh*, 342 N.C. 879, 881, 467 S.E.2d 410, 411 (1996) ("If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract." (citing *Lane v. Scarborough*, 284 N.C. 407, 410, 200 S.E.2d 622, 624–25 (1973))).

52.     The language of the OTA is plain and unambiguous and requires the Estate to transfer Barnes's remaining ownership interest in TBBW to Willard upon Barnes's death. The Estate has failed to do so and has not offered evidence supporting a defense to this claim. The Estate is therefore in breach of the OTA, and summary judgment should be entered for Willard requiring the Estate to transfer Barnes's ownership interest in TBBW to Willard.

### 5.     Count 8: Attorneys' Fees & Costs

53.     Plaintiffs seek through Count 8 of their Complaint an award of attorneys' fees and costs under section VII.2(b) of the OTA for the Estate's breach of contract. (Pls.' Br. Supp. 13–14.) That provision provides, in relevant part, as follows:

> Barnes and BWI agree to indemnify and hold harmless Willard and his successors and assigns from and against any and all liabilities, losses, claims, costs, and damages and reasonable attorneys' and accountants' fees and expenses, court costs, and all other reasonable expenses suffered or incurred by any of them in connection with or arising from:
>
> . . .

(b) any breach by Barnes or BWI of any of their obligations or covenants contained in [the OTA].

OTA § VII.2(b).

54. Because the Court has concluded that the Estate breached the OTA by failing to transfer Barnes's ownership interest to Willard upon Barnes's death, the Court further concludes that Willard is entitled to recover under section VII.2(b) the reasonable attorneys' fees, accountants' fees, expenses, and court costs Willard has incurred arising from the Estate's breach. Accordingly, Plaintiffs' motion shall be granted to this extent, and the Court shall enter judgment against the Estate as to liability on this claim. Plaintiffs' motion is otherwise denied.

F. Plaintiffs' First Summary Judgment Motion (on Defendants' Counterclaim 1)

55. Plaintiffs move for summary judgment seeking dismissal of Defendants' Counterclaim 1 and recovery of their attorneys' fees associated with this Motion under N.C.G.S. § 6-21.5.[14] (Pls.' Mot. Partial Summ. J. Countercls., Decl. TBBW Owns Subaru & Att'ys Fees Associated Mot. 1–2, ECF No. 73.)

56. BWI seeks through Counterclaim 1 the return of a 2014 Subaru titled in BWI's name but currently in Willard's possession which Willard refuses to return after BWI's demand. Alternatively, BWI seeks payment for the Subaru's fair market value. (Amendment Ans. & Countercl. 1–2, Ex. 1 Certificate of Title, ECF No. 25; Defs.' Br. Resp. Pls.' Br. Supp. Mot. Partial Summ. J. & Att'y Fees 7, ECF No. 76.)

---

[14] Defendants initially asserted two counterclaims, and Plaintiffs sought dismissal of each in their First Motion for Summary Judgment. Because Defendants subsequently filed a voluntary dismissal of Counterclaim 2, (ECF No. 96), Plaintiffs' motion to dismiss as to this counterclaim is now moot.

57. Plaintiffs do not dispute that title to the Subaru is issued to BWI. Rather, Plaintiffs contend that because TBBW paid at least 90% of the purchase price as well as the maintenance fees, insurance, and taxes, and because the Subaru was driven exclusively for TBBW's business, TBBW should be declared the owner of the Subaru and BWI's Counterclaim 1 should be dismissed. (Br. Supp. Pls.' Mot. Partial Summ. J. Countercls., Decl. TBBW Owns Subaru & Att'y Fees & Costs Associated Mot. 7, 11 [hereinafter "Pls.' Br. Supp. 1st Summ. J. Mot."], ECF No. 74; 1st Willard Aff. ¶¶ 2, 4–7, 9.) Plaintiffs argue that the Subaru was mistakenly titled to BWI at a time when a Chrysler PT Cruiser titled to BWI was sold to pay 10% of the Subaru purchase price. (Pls.' Br. Supp. 1st Summ. J. Mot. 1, 4; 1st Willard Aff. ¶¶ 4–9.) Defendants rely entirely on the certificate of title for their claim that BWI owns the vehicle as a matter of law.[15]

58. Under North Carolina law, a titleholder "is not estopped to assert her title to the car . . . merely because she left it in the possession of [another], unless [the titleholder] clothed [the possessor] with some indicia of title." *Mabe v. Dillon*, 46 N.C. App. 340, 342, 264 S.E.2d 796, 797 (1980); *see also Hawkins v. M. & J. Finance Corp.*, 238 N.C. 174, 178, 77 S.E. 2d 669, 672 (1953) ("It is elemental that the owner of personal property will not be estopped to assert his title by merely entrusting its

---

[15] Although it is unclear from the briefing whether any party contends that the Uniform Commercial Code ("UCC") applies to Defendants' Counterclaim 1, the Court concludes that it does not because Defendants do not allege a sale, transaction, or transfer of goods between TBBW and BWI. *See Hensley v. Ray's Motor Co. of Forest City, Inc.*, 158 N.C. App. 261, 265, 580 S.E.2d 721, 724 (2003) (noting that "[t]he scope of the UCC is limited to 'transactions in goods'" (quoting N.C.G.S. § 25-2-102)).

possession and control to another" absent "clothing [that person] with other *indicia* of ownership[.]"). Examples of "indicia of title" include "the key or the certificate of title." *Mabe*, 46 N.C. App. at 342, 264 S.E.2d at 797. Both Willard and BWI offer evidence reflecting "indicia of ownership" to support their positions and dispute that the other owns the Subaru. Both BWI's title certificate and Willard's evidence are consistent with ownership, and the Court therefore concludes that a jury must determine who actually owns the car. Accordingly, the Court denies Plaintiffs' motion as to Counterclaim 1.[16]

V.

CONCLUSION

59.    **WHEREFORE**, based on the foregoing, the Court hereby **ORDERS** as follows:

> a. Defendants' Motion to Dismiss Notice of Lis Pendens is **GRANTED**. Accordingly, the Notice of Lis Pendens that TBBW (i) filed in Iredell County on December 6, 2019, (ii) represents it filed in Davie County on an unidentified date, and (iii) filed on the Business Court's electronic docket on January 6, 2020, (ECF No. 93), is hereby **CANCELLED**. The Clerks of Superior Court of

---

[16] Plaintiffs seek attorneys' fees under N.C.G.S. § 6-21.5, asserting that Counterclaim 1 is frivolous since the Subaru's title is the only evidence of BWI's ownership and that Defendants should have voluntarily dismissed Counterclaim 2 earlier because it was fatally deficient. (Pls.' Br. Supp. 1st Summ. J. Mot. 4.) The Court's denial of Plaintiffs' motion as to Counterclaim 1 precludes an award of fees and costs on that claim. The Court shall resolve Plaintiff's request for attorneys' fees and costs concerning Defendants' dismissal of Counterclaim 2 by separate order.

Davie County and Iredell County, as appropriate, shall, pursuant to N.C.G.S. § 1-120, cancel the Notice of Lis Pendens from the Record of Lis Pendens kept by the Office of the Clerk pursuant to N.C.G.S. §§ 1-117 and 7A-109.

b. Plaintiffs' First Summary Judgment Motion is **DENIED** as to Counterclaim 1 (the Subaru) and **DENIED as moot** as to Counterclaim 2.

c. As to the parties' Cross-Motions concerning Plaintiffs' Counts 1–3 (fraudulent conveyance), Plaintiffs Second Summary Judgment Motion and Defendants' Motion for Summary Judgment are each **GRANTED in part** and **DENIED in part**.

    i. Plaintiffs' Second Summary Judgment Motion is **GRANTED** and Defendants' Summary Judgment Motion is **DENIED** to the extent those claims are based on Barnes's fraudulent transfer of TBBW's good will to BWI, and the Court hereby enters judgment for Plaintiffs and against the Estate and BWI as to liability on those claims to this extent; and

    ii. Defendants' Summary Judgment Motion is **GRANTED** and Plaintiffs' Second Summary Judgment Motion is **DENIED** to the extent those claims are based on the transfer of any tangible or intangible assets of TBBW other

than TBBW's good will, and the Court hereby enters judgment for Defendants dismissing those claims to this extent with prejudice.

d. Plaintiffs' Second Summary Judgment Motion is further **GRANTED in part** and **DENIED in part** as follows.

   i. The Motion is **GRANTED** as to:

      1. Count 5 (fiduciary duty), and the Court hereby enters judgment for TBBW and against the Estate as to liability on that claim;

      2. Count 8 to the extent that claim is based on Willard's reasonable attorneys' fees, accountants' fees, expenses, and court costs arising from the Estate's failure to transfer Barnes's ownership interest in TBBW to Willard, and the Court hereby enters judgment against the Estate as to liability on that claim; and

      3. Count 9 to the extent that claim is based on the Estate's failure to transfer Barnes's ownership interest in TBBW to Willard upon Barnes's death, and the Court hereby enters judgment for Plaintiffs on that claim and orders that the Estate shall

transfer Barnes's ownership interest in TBBW to Willard.

  ii. The Motion is **DENIED** as to:

    1. Count 4 (conversion), and the Court hereby enters judgment for Defendants dismissing that claim with prejudice;

    2. Count 6 (equitable relief), and the Court hereby enters judgment for Defendants dismissing that claim with prejudice;

    3. Count 8 to the extent that claim is based on the Estate's failure to transfer real property to Willard, and the Court hereby enters judgment for Defendants dismissing that claim without prejudice; and

    4. Count 9 to the extent that claim is based on the Estate's failure to transfer real property to Willard, and the Court hereby enters judgment for Defendants dismissing that claim without prejudice.

e. Defendants' Summary Judgment Motion is **GRANTED** as to Count 10 (tortious interference with contract), and the Court hereby dismisses that claim with prejudice.

f. As a result of the Court's rulings, the following claims and counterclaims shall proceed to trial:

    i. Damages in connection with Plaintiffs' Counts 1–3 (fraudulent conveyance) to the extent those claims are based on Barnes's fraudulent transfer of TBBW's good will to BWI;

    ii. Damages in connection with Plaintiffs' Count 5 (breach of fiduciary duty);

    iii. Plaintiffs' Count 7 (unfair and deceptive trade practices);

    iv. Damages in connection with Plaintiffs' Count 8 (attorneys' fees, accountants' fees, expenses, and court costs) to the extent that claim is based on the Estate's failure to transfer Barnes's ownership interest in TBBW to Willard upon Barnes's death;

    v. Damages in connection with Plaintiffs' Count 9 (breach of contract) to the extent that claim is based on the Estate's failure to transfer Barnes's ownership interest in TBBW to Willard upon Barnes's death; and

    vi. Defendants' Counterclaim 1 (the Subaru).

**SO ORDERED**, this the 9th day of October, 2020.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge